The first case called for oral argument is In Re of Marriage of Rees. Counsel, whenever you're ready, please proceed. Good morning, Your Honor. May I please call the trial counsel? My name is Jordan Grimels, and I represent the appellant, William Rees, in this matter. I was one-third of this trial counsel in this matter. I fell to the final four, as you know from the record. I'll go real quick with the standard of reviews. This court is well aware it is the manifest the sort of use of discretion standard, which I know I have a very high hurdle with that standard. Basically, I'm saying that no other reasonable person could have ruled the way the trial court ruled. And along with my brief, hopefully today I'll share some insight on why I think that is the case. First off, the appellee's brief does correctly state that we do have five issues specifically with the trial counsel ruling. First is with respect to failure to take up the motion to reconsider in a timely fashion. And or with that, when it did finally modify its final order of maintenance to $1,000 a month, it did not make that modification retroactive to the date of the original filing of the motion to reconsider. And the court had discretion to do that, right? Correct, yes. And so you have to convince us that no reasonable person would have done otherwise. I understand. Like I said, I know it's a large hurdle. Did you know the judge before on the other cases? I'm sorry? Did you know the trial judge on the other cases? Yes, I've talked to him many times. Yes. First, I think that, as we can see, there's a temporary order issued in October of 2012, which assigned my client to pay the mortgage of the residence, temporary maintenance, the amount of $2,000, the party's daughter's car payment. He needed to keep health insurance on all the parties, as well as not take into account his rent, his gas to work. Long story short, my client simply couldn't afford to do that. The numbers didn't work out for him. He immediately filed the motion to reconsider, citing this, citing he could not afford to do this, he could not afford this, all of these court orders. However, the court did not take it up. Then he switched attorneys because his attorney got elected to the state's attorney. And so that dragged this thing out further. Then him and, I believe, his second attorney, Mr. Alan Ferris, had a disagreement with some filings. So when the motion to reconsider and final issues hearing was then set, it did not get taken up. Mr. Ferris withdrew. Finally, I get in the case, and the motion to reconsider did not get heard until May of 2013. My reading of the case law states the court may retroactively go back, and two things have to happen. One, that there has to be due notice that we're going to ask for this, and the facts that we're requesting were known to everyone at the time of that notice. He couldn't afford to do this temporary order. His notice was filing his motion to reconsider in October of 2012, immediately after the temporary hearing. Finally, I think there's further evidence the trial court realized $2,000 a month was too high. It, in its final order, made a modification to the maintenance that would have been due in April of 2013. I'm sorry, it made it $1,000. This shows that it was already making one modification. So my question being, what troubles me is if $2,000 was too much for April of 2013, why was $2,000 not too much for March of 2013 and so on back to October of 2012? Further, the client in 2012 had mortgage, car payment, health insurance, et cetera. When the court realized $2,000 was too high, there was no mortgage anymore. The health insurance was going to be each party's own responsibility. So the court, even knowing my client is going to have less debt attached, lower maintenance on a retroactive basis, I just submit that they should have, the court should have went back to October 2012 with its modification. The second issue I take up is with the issue of final maintenance. I do know that there was a final maintenance, as I said, $1,000 a month awarded to be reviewed in 2015, which was my client's possible retirement date on cards. I would submit that this mortgage is too high first with – or I'm sorry, this maintenance is too high first when we look at the appellee received approximately 75% of the proceeds from the sale of the marital home. The appellee received about 90% of the household items, and she was getting 50% of my client's retirement as well as receiving 100% of an income-producing business. There are many factors with respect to maintenance. I believe the court looked at one of them solely, which is the fact that my client makes a large sum of money when looking at the appellee. Now, I did cite a case that states it's self-imposed, poverty cannot be used as a maintenance claim. The appellee testified she made approximately $9,000 the prior year at her beauty salon. I do, from looking at the record, and I brought this up in a motion to reconsider, I think that testimony is highly questionable. One, the numbers that she gave during the trial, she would have already been more than $9,000 a year just from rent alone at the booths. Two, she failed to mention her trust income in a pleading that was filed under oath, and I don't believe her income is accurate. But that aside, she also left this marriage in a far superior position than she got into it in. She don't have a mortgage anymore. She don't have a $1,200 mortgage. She don't have to pay for the driver's car payment. Her student loan is neutralized. The credit card debt is neutralized. My client took a camper with a loan. He's taking that debt. My client's paying the rent, and there's no – she pretty much walked away from this debt-free. So while I do appreciate the fact that a person is supposed to live comfortable or as semi-comfortable as they did during the marriage, she was already walking out better off than she was during the marriage. She's basically getting a fresh start without having to file bankruptcy, debt-free. So for that reason, I think the maintenance should have been lowered based on the other divisions. And I want to make sure I don't run out of time, so I'm going to go skip and go to the retirement distribution. As we know, there's two approaches for the retirement accounts. This court chose to use the reserve jurisdiction approach. The court stated it would do so namely because my client has an expected retirement date of 2015. The court made some assumptions. The court stated that he's not going to go any further in corrections, so this isn't going to hurt him. His pension won't increase. Well, that's just false. There's nowhere in the record that says he can't be assistant warden, director of corrections. We just don't know. That's just an assumption. I think it's unfair to place that burden on my client with that kind of assumption. Also, the court stated it did not have a set dollar amount it could have used, and that was another reason it was going to use one. My client's attorney prior to me, Mr. Ferris, submitted a document that showed that he would be receiving $6,120 per month as of March 2015 if he retired. Now, I do get that that's not the exact number. As of date of marriage, we would have been willing to give, I believe, the benefit of that extra year of money and our extra two years of money. I'm sorry. And the court could have used a set dollar amount. The biggest problem I have with retirement, and I didn't find much on this, and this might be something that we'll be able to support after this case. My client has mandatory retirement contributions come out of his check. They're not his choice. If he works for another five years, he's going to spend hundreds and hundreds of dollars a month to make this retirement grow. That is all post-dissolution, non-marital contributions. The way this order is, the athlete is going to get the benefit of that. That is non-marital money that she will get the benefit of. I don't think that's right. In any event, perhaps the court should have had her set off for that or something like that. Like I said, I didn't find much on this with respect to Illinois law, so I don't have a bunch of current cases to tell you that I'm right. But I do think it's something that's not equitable. I mean he could work for another ten years, and he's going to pay every single – every two weeks, he's going to pay money in his retirement well after this divorce is over. And with this Hunt formula, with the reserve jurisdiction approach, the athlete is going to get the benefit of all these non-marital contributions. And I do not think that's fair to my client. I don't think it's equitable to my client to include that non-marital money. Also, that's his livelihood. He's worked to get that retirement. I don't believe that just because they were married it has to be a blank at 50%. And I think the law suggests it doesn't. The court has the discretion to set it at a different percentage based upon other distributions. Where, again, she's getting $1,000 a month maintenance. She got an income-producing business, which by her own testimony could be making more money. It's unfortunate it's not, but it seems that she could do some things to make it more profitable. Also, she got about 90% of the personal items in the home, and she got over $30,000 in home proceeds from the sale of the marital home. So she got a large chunk of this marital estate. So I think the court could have looked at this and said, well, maybe we don't want to use 50%. Maybe we'll stick with the reserve jurisdiction, but I understand that she's gotten a lot. I don't have to use the blank at 50%. Once again, this is in the court's discretion. I understand that. Another issue we have is with the attorney's fees. The trial judge made a comment on my motion to reconsider hearing that he did adjust the Applebee's trial attorney's fees on the usual customary rate. I don't think that he did that, and it could have been a simple error. But in the end, my client paid approximately $7,750 in attorney's fees towards the Applebee's attorney. $7,750 of that was ordered by the trial court directly from his proceeds of the sale of the marital home. Then, as you know from my brief, there was a $4,000 marital debt that got negotiated. There was $4,000 left in the negotiation of that. I'm sorry. In my mind, $2,000 of that should have been my client's. $2,000 of that should have been the Applebee's. Now, I know what the trial judge did. He said, Applebee, go ahead and keep that because I'm not going to give it to Mr. Reese and then turn $2,000 back to you. There's no reason to do that. That wouldn't make sense. And I understand that. But the usual customary rate in Randolph County for practicing attorneys is anywhere from $150 to $175. I'm at $150. I get it. I'm younger. Somewhere at $175. We're certainly at not $295 an hour. Had the judge used $150 with the bill that was submitted, the total amount of attorney's fees would have been $5,637. There was also a cost advance by the Applebee's attorney for $400 for an appraisal of the marital home. Once again, that benefited both parties. My client should not have had to pay $400 for that. They should have each borrowed $200 of that because it benefited them to get rid of their marital home and get out from under that debt. Lastly, if not least, I don't believe that Applebee's showed she had an ability to pay for attorney's fees. Once again, she walked away with over $30,000. She walked away with an income-producing business. She walked away with all of the proceeds – or I'm sorry, all of the marital property. That was 90% of it. Never once did she say, I don't have the ability to pay my attorney's fees. Simply the judge said, well, since I'm giving you maintenance, I understand you need help, so it would be foolish of me not to give you contribution too. I think she had learned enough means to pay for attorney's fees in this matter, specifically with the sale of proceeds from the marital home. And now I'll go back to that because I'm sure I'm touching close to my time here. With respect to the proceeds of the marital home, this is where I think it is also wrong. The petitioner was awarded over $30,000 of these proceeds. Now, I understand that the appellee is going to make the large point that my client owed back maintenance. He didn't comply with the court order. We understand that. You certainly never said he did. What we're saying is he couldn't, and he tried to tell the court he couldn't when he filed the motion reconsidered within a week after the temporary order. So he was owed – or the appellee was owed $6,000 of back maintenance, which was awarded from the proceeds of the sale of the marital home, which that's fine. We owed it. We're not disputing that. But then the trial court went and ordered another $3,000 from my client to be paid to the appellee for reimbursing herself for the maintenance of the court claim she paid herself. And I know this is very confusing, and it's confused me since the court order, which, in effect, the way I read this is the appellee was awarded $9,000 for $6,000 of back maintenance. That other $3,000 should have stayed in my client's pocket. There was also the $4,000 marital – there was a $10,000 credit card debt. It took $6,000 to negotiate it. $4,000 is left in my – or the appellee's attorney's trust account. The judge said I'm going to go ahead and let the appellee keep that $4,000. Well, I know he did it for attorney's fees, but still, it wasn't fair to my client to split – to not split that fee up. That was a debt both of them are responsible for, that debt being forgiven. Any money that was used to negotiate that debt that was left over was both of their money. It should have went back into the community pot. I propose that the fair – the more fair yield and equitable distribution of the sale proceeds would have been the appellee getting more because she was owed some more, $22,585.31, and my client getting $16,800.06. Once again, I know the court had the discretion to appropriate these monies however it saw fit, but when you look at the grand scheme of this picture, we have an appellee who walked away with 75 percent of the proceeds from the sale of a marital home. She got pretty much all of her attorney's fees paid one way or another by my client. She got a blanket 50 percent of the marital month's retirement while my client still has to deal with contributions. She got 90 percent of the household goods simply because it was a long marriage and my client was in a position that he made a lot of money. It's not a fair distribution. We're opening the door here to any time someone makes more money than the other spouse, be it the husband or the wife, we're going to just blanketly award attorney's fees. We're going to just throw you more money than the other person. A divorce or a dissolution of marriage, as the appellee said, probably the fairest one is when everyone leaves unhappy. But this is not just a case of my client leaving unhappy. He feels like it's unfair. He feels like it's unreasonable. He feels like it's an abuse of discretion. And that's all I have at this time. Is there any questions from the court? I don't believe so. Thank you, counsel. Thank you. Counsel? Good morning. Justices of the court, I'm here on behalf of Kelly Reese. He pleads the court, Mr. Reynolds, and he's going on 40 years in some form of involvement in the practice of law. I'm still waiting for that case, to see that case where a trial judge handling a divorce after hearing all of the issues contested looks out to the parties and says, before he announces his decision, everybody going to be happy, happy, happy. And the very reality that nobody walks away from divorces happy is why this court gives such a high deferential treatment in reviewing the hard decisions that trial judges have to make in divorces, especially ones like this, where the parties are going to walk away in worse condition, both of them, than when they walked in and they could pool everything they had. In a marriage, they could pool their resources and live a better life. In that regard, one of the things counsel says in the position Mr. Reese takes in this case is, well, she walked away in better condition than she entered the marriage. Maybe so. She didn't walk away in a better condition than she had in the marriage. The test has never been to look at what a woman's lifestyle was when she entered into the marriage and say, well, you're better off than when you came. So everything that you got, because you're better off, there's abuse of discretion. There is a very high level of deference to the trial court, and I would submit that in this particular case, if you look at the issues as a whole, that Judge Gross made decidedly reasonable decisions rather than simply not acting unreasonably in this case. It's difficult to parse one by one and not look at the totality of the circumstances, because they're all tied together in this case. As a matter of fact, it's a classic case for this court to trumpet to the practitioners in this district who want to contemplate an appeal of divorce, hey, only if these decisions are irrational do you get relief on your deal. Let's take a temporary maintenance of more than $2,000. That temporary order of September 5, 2012 required the defendant to pay the mortgage, to continue to pay the credit cards, to pay $2,000 in maintenance. He had a net income of $7,300. Mrs. Reese had a net income of slightly under $1,000. So at the end of the day, she had $2,800 to live on, and she had to find someplace to live. He, however, had $3,570 net after he paid all those obligations and a place to live. What's the answer to that? Why did he stop paying everything after the order? Why did he not pay the mortgage, allow the house to fall into default and foreclosure, and incur $5,400 in foreclosure expenses that had to be taken out of the sale process? Why did he do that? In order to answer this, we earned this money. The numbers didn't work out for him. He couldn't pay. That's absolutely undeniable wrong. He chose not to pay. And he created a dilemma for the court, which ultimately had to be worked out in a way where Mrs. Reese received a lot more out of what was left of the sale proceeds. After all the other obligations had to be paid. Let me point out that with regard to this first issue of reconsideration, that on March 6, 2013, Mr. Reese was finally brought in front of the court and questioned about, why'd she stop paying everything? And at the end of the day, we didn't litigate it. There was a consent order issue. And in that consent order, Mr. Reese said that he owed $6,000 in back maintenance. And he agreed in that consent order that that back maintenance would be paid out of the proceeds of the sale of the house. Now, the judge ordered that that would be paid out of the proceeds of the house at the date of the closing, which in effect meant that when Mrs. Reese got the unpaid maintenance of $6,000 out of the sales proceeds, if we assume she was entitled to 50% of the sales proceeds, she in effect ended up paying $3,000 of her own nonpaid maintenance. And that was factored in in the final judgment. There's nothing wrong with Judge Gross's math here. What he was trying to do was make sure that Mr. Reese ended up paying what he was obligated to pay and intentionally decided not to pay. He created a mess that Judge Gross was required to clean up, and he did a fine job of it, a fair job. Mr. Reese argues that the way Judge Gross handled the pension situation is not fair and equitable because he's going to continue to pay into this pension. I will submit to the court that the reserve jurisdiction method of dividing divorces has been in effect and being used by Illinois trial judges since 1979, and that formula was developed in the case of in-ring marriage of Hunt. It might not be fair and equitable, but in Illinois, under the law, it isn't an abuse of discretion to apply a methodology that has been accepted since 1979. Divorces can't be an abuse of discretion to apply the law. Well, as a matter of fact, counsel argues that he's putting money into the pension, but every additional year he works, he increases his percentage of the amount that he gets because the formula takes into account a ratio of the number of years of the marriage versus the total number of years he worked. So, I mean, the formula accounts for him paying an extra year. Precisely. Precisely, Justice Stewart. It's in place, and it will take account because it's times .50. The formula is there to exist to take that into account, but it does allow Mr. Reese to share in any incremental increases by that formula. The $1,000 maintenance issue. Mr. Reese takes the position that she cannot allow herself to fall into poverty. Her beauty shop should be making less than just slightly under $1,000 a month, and he claims that because she's doing that, that she's doing something comparable. To the principle of law enunciated in In Re, the Marriage of Schuster. Well, this is totally unrelated to that case. Alan Schuster was married to his wife who had a good income. He had an engineering degree and was an engineer, and he quit doing that because he didn't like it. Then he went and got a law degree, and he had a $1,000 job as a lawyer, and he didn't like lawyering, so he decided to do nothing. And then he asked his wife to pay maintenance. She said, no, you can't impoverish yourself and then claim maintenance. That's not what this is about. This is Reese just simply doesn't have the income-making ability, and yet it's accounted for very reasonably by Judge Gross when he says, look, things could change. I'm not going to award permanent $1,000 maintenance here. I'm going to do that because things are as they are right now, and you're not making much money. But you go on and try to make more in that beauty shop. And I will say this in terms of the reply brief. I want to pay apologies to the people, the men and women who would go to beauty salons in and around Steelville, Illinois, when I claimed it's not a center of glamour. There could possibly be many people glamour around there that go in and use and want to look good. People want to look good. But the truth of the matter is Mrs. Reese, in this beauty business, in the area where she is, is going to have a difficult time making a lot of money. Suppose she does. Well, things can change because there's mandatory review of this decree in June of 2015. And that's a very reasonable thing for the judge to have done. All in all, when you consider this case as a whole, there's one thing, another thing that was unique. The March 6, 2013, order contemplated the earlier lawyer, Alan Ferris, receiving $3,000 in fees that he had incurred to be paid out of the monies that Mr. Reese received after everything else was deducted from the sales proceeds. But that's not what happened. Alan Reese received his $3,000 from the sale at the closing, which in effect meant that by doing it in that fashion, Mrs. Reese got the pleasure of paying half of Mr. Ferris' fees. I mean, that's just an aside that happened. It just doesn't change, in my view, the overall reason for all these issues. But it is something that, again, because of the way Mr. Reese behaved from September 5th until, actually, in effect, May of 2013, where he retained all of his net income at the expense of the marital estate by choice, things like that happened. At the end of the day, when this case is looked at, I think it's a classic case of a judge exercising the discretion that judges have to make the best of a bad situation. That's probably the case in every divorce. And I think that the judgment of Judge Gross should be clearly affirmed by this court, but particularly under the deferential scope of review that this court must apply in divorce cases. I'd be happy to answer any questions. I don't think there are. Thank you, counsel. Counsel? Thank you. Once again, may it please the court, counsel, just a few on rebuttal. Perhaps I made a mistake in saying that she walked out of this marriage in a better position than she walked into the marriage. If I said that, I apologize. What I meant is she's pretty much in a better situation all around. She is debt-free. I don't know if she is if she sits here today. At the time of the divorce, she got forgiven on the mortgage. House got sold. Credit card debt? Banished. Daughter's student loan payment? Gone. Daughter's car payment? Gone. She's renting. She didn't own. Her debts and liabilities and financial obligations were nothing compared to what they were during the divorce. So that being said, I understand these people live probably out of their means with respect to what he makes and what she claims she made. But those debts and obligations were gone for her now. She doesn't have that same type of lifestyle. She doesn't have a house with a $1,200 mortgage payment. She doesn't have to live as she did during the marriage dollar for dollar. Second, with respect to the consent order that was signed, I obviously was not in the case yet. But to me, someone simply saying, you know what, Judge? You did order me to pay that, and I didn't. I do owe it. That is a lot different than saying I agree with your numbers, Judge. I agree that I owe this. I'm going to pay it just because I think it's right. No, he – it was a court order. He faced contempt. So, yeah, he's going to agree he owed it because whether they were – the judge is going to modify it or not, as we all know, you have to follow orders. So whether he thinks he should have owed $6,000 or he thinks he should have owed $80, the court order had him owing $6,000 at that point. So, yeah, he's going to say, you're right, Judge. I owe it. I'll pay it because no matter what his disagreements with the numbers were, the court order had him owing that. So I won't – I will submit that that's not the same as him saying, yes, I agree with it. And by the way, I think it's a dank fine number, and I'm going to go ahead and sign this order here saying that I think everything you did was right, Judge. I just don't think that's what you had there. Like I said, I wasn't his attorney at that time. But I would guarantee that he was probably wearing out possible sanctions of contempt, jail time, etc. if he didn't get this order paid somehow. Now, with respect to Mr. Farris's fees, that is something I noted from the affidavit's brief, and I am glad he brought it up. I feel that. I feel that the same way as I feel about the other thing. If, in fact, this court was going to choose to change the judge's order in any way and the court wanted to account for Mr. Farris's fees and give my client less than what I proposed he should have got due to that, well, that's fine because my whole thing is half of this pie was each of theirs. Also, with respect to my client not paying what he was ordered to pay, he couldn't. He just couldn't. Once again, this is – had I been his attorney throughout it, I'd have a lot more permission for you guys. But the point is I think when you file a motion to reconsider right away, it's not just because you're unhappy. It's because, hey, well, I can't pay this. He was already paying a lot of this stuff before the maintenance was ordered. Then he gets hit with $2,000 additional. As we all know, it might – his financial statement might have said he makes $7,000 after taxes, etc. That doesn't mean that's what he gets put in the bank every month. I don't even believe he got to keep $3,000 in the bank a month. And I also think if we're going to talk about financial statements, as I raised in my motion to reconsider, the appellee's financial statement was questionable at best. It didn't list the trust income. She said, well, I don't even know how long I've had it. It claims she's only making $1,000 a month at a beauty shop, which that would mean she's probably well below the poverty line. So I don't know how they made it on their lifestyle even with my client's salary. That being said, I think the judge took a harder look at the not credible testimony of the appellee here when he made these decisions. I'm not here to bash Judge Gross. I'm in front of him all the time. I think he makes very fair decisions. However, I have a disagreement with this one. I understand he had discretion. In this one, we just think he might have got it wrong. He used – he didn't use discretion as we think a reasonable person would, and that's where I am, folks. Did you have any questions? No. I don't believe we do. Okay. Thank you, Your Honor. We appreciate the briefs and arguments from counsel. We'll take the case under advisement. Thank you. Or it will be in a short recess. Appreciate it.